**Electronically Filed
Intermediate Court of Appeals
30397
25-JAN-2012
08:45 AM**

NO. 30397

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


MAUNA KEA ANAINA HOU; ROYAL ORDER OF KAMEHAMEHA I;
SIERRA CLUB, HAWAIʻI CHAPTER; KAHEA; and CLARENCE CHING,
Petitioners/Appellants-Appellants,
v.
UNIVERSITY OF HAWAIʻI and UNIVERSITY OF HAWAIʻI
INSTITUTE OF ASTRONOMY,
Respondents/Appellees-Appellees,
and
BOARD OF LAND AND NATURAL RESOURCES,
Appellee-Appellee


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 09-1-0336)


MEMORANDUM OPINION
(By:  Foley, Presiding J., and Circuit Judge Browning
and Circuit Judge Castagnetti in place of Nakamura, C.J.,
Fujise, Leonard, Reifurth, and Ginoza, JJ., all recused)

Petitioners/Appellants-Appellants Mauna Kea Anaina Hou
(MKAH); Royal Order of Kamehameha I (ROOK); Sierra Club, Hawaii
Chapter (Sierra Club); KAHEA (KAHEA); and Clarence Ching (Ching)
(collectively, Petitioners) appeal from the Final Judgment filed
on February 17, 2010 in the Circuit Court of the Third Circuit[1]
(circuit court).  Pursuant to the January 27, 2010 "Order
Granting Appellees University of Hawaiʻi and University of Hawaiʻi

_____

[1]  The Honorable Glenn S. Hara presided.

Institute for Astronomy's Motion to Dismiss Appeal Filed October 20, 2009" (Order Granting Motion to Dismiss), the circuit court entered judgment in favor of Respondents/Appellees-Appellees University of Hawaiʻi Institute for Astronomy (UHIFA) and University of Hawaiʻi (UH) (collectively, University), and Appellee-Appellee Board of Land and Natural Resources (BLNR)[2] and against Petitioners as to all of Petitioners' claims.

On appeal, Petitioners contend the circuit court erred in

(1) finding it did not have jurisdiction, pursuant to HRS § 91-14 (1993 & Supp. 2009), to review BLNR's approval of the Mauna Kea Comprehensive Management Plan, UH Management Areas, January 2009 (CMP)[3] when the court determined that the BLNR hearing (held on April 8 and 9, 2009) was not a contested case hearing;

(2) finding it did not have jurisdiction to review BLNR's denial of Petitioners' request for a contested case hearing in compliance with HRS Chapter 91 and DLNR regulations when the court determined that, pursuant to HRS § 91-14, the denial was not an appealable order;

(3) failing to consider whether it had jurisdiction to hear Petitioners' appeal pursuant to Hawaiʻi Administrative Rules (HAR) § 13-5-3 by failing to address whether BLNR's decision to deny Petitioners' request for a contested case hearing was a final order; and

(4) dismissing Petitioners' appeal for lack of jurisdiction based on an incomplete record and misapplying the standard of review for a motion to dismiss for lack of subject matter jurisdiction.

---

[2] The BLNR is the executive board of the State of Hawaiʻi, Department of Land and Natural Resources (DLNR). Hawaii Revised Statutes (HRS) § 171-3 (Supp. 2010).

[3] We take judicial notice of the CMP as a "matter of public record and easily verifiable." Williams v. Aona, 121 Hawaiʻi 1, 11 n.6, 210 P.3d 501, 511 n.6 (2009); Hawaii Rules of Evidence (HRE) Rule 201. The CMP may be accessed at http://hawaii.gov/dlnr/occl/manuals-reports.

I.

A.    Agency Proceedings

On April 8 & 9, 2009, BLNR held public hearings[4] pursuant to HRS Chapter 92 on University's proposed CMP. Petitioners individually testified at the hearing and each orally requested a contested case hearing.  At the close of the hearings, BLNR approved University's CMP, subject to eight conditions.  On April 17, 2009, Petitioners each submitted a written petition to BLNR requesting a contested case hearing on the approved CMP.  After an August 28, 2009 hearing, BLNR denied the requests for a contested case hearing.  BLNR reasoned that no statute, rule, or constitutional due process requirement mandated a contested case hearing on its decision to approve the CMP or on the requests for the contested case hearing.  On September 1, 2009, BLNR sent Petitioners written confirmation of its denial of Petitioners' requests for a contested case hearing.

B.    Circuit Court Proceedings

On September 28, 2009, Petitioners filed a notice of appeal to the circuit court.  Petitioners appealed BLNR's (1) April 9, 2009 decision to accept and approve the CMP, alleging a violation of their statutory and constitutional due process rights, and (2) August 28, 2009 decision to deny Petitioners' written requests for a contested case hearing.

On October 20, 2009, University filed a Motion to Dismiss Appeal (Motion to Dismiss).  On October 23, 2009, BLNR filed a joinder in the Motion to Dismiss.

On December 29, 2009, in a memorandum decision, the circuit court granted University's Motion to Dismiss.  The circuit court filed its Order Granting Motion to Dismiss on January 27, 2010 and the Final Judgment on February 17, 2010.

On March 17, 2010, Petitioners timely appealed.

_____

[4]  We take judicial notice of the BLNR minutes as a "matter of public record and easily verifiable."  Williams, 121 Hawaiʻi at 11 n.6, 210 P.3d at 511 n.6; HRE Rule 201.  The minutes may be accessed at http://hawaii.gov/dlnr/chair/meeting/minutes/2009/090409-minutes.pdf.

II.

A.    Mauna Kea Science Reserve

The summit area of Mauna Kea on the Island of Hawaiʻi, identified as the Mauna Kea Science Reserve (Science Reserve), is public land owned by the State of Hawaiʻi and subject to the jurisdiction of BLNR.  In 1968, BLNR entered into a 65-year lease with University for the Science Reserve.  The University has two telescopes in the Science Reserve and subleases portions of the land to other telescope facilities.  At the time the CMP was written, the Mauna Kea summit was supporting twelve telescopes.  Each facility is governed by a Conservation District Use Permit (CDUP).  The University also leases from the BLNR the mid-elevation telescope support facilities at Hale Pōhaku (around 19 acres) and the Summit Access Road from Hale Pōhaku to the Science Reserve boundary.  Together, these three leased areas (Management Area) are the focus of the CMP.

The Management Area is located in a conservation district resource subzone.  Conservation districts are "those lands within the various counties of the State bounded by the conservation district line."  HRS § 183C-2 (Supp. 2010).  In implementing the statute governing land use in conservation districts, the legislature found that

> lands within the state land use conservation district contain important natural resources essential to the preservation of the State's fragile natural ecosystems and the sustainability of the State's water supply.  It is therefore, the intent of the legislature to conserve, protect, and preserve the important natural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety and welfare.

HRS § 183C-1 (Supp. 2010).  HAR Chapter 13-5 provides the regulatory scheme to implement HRS § 183C (Supp. 2010) and has as its purpose the conservation, protection, and promotion of the long-term sustainability of natural resources through appropriate management and use.  HAR § 13-5-1.  HAR § 13-5-10 establishes conservation district resource subzones -- areas with specific boundaries and resource characteristics within a conservation

4

district.  HAR § 13-5-2.  The Management Area is encompassed in "conservation district resource (R) subzone," described pursuant to HAR § 13-5-13:

> (b)    The (R) subzone shall encompass:
>
> (1)    Lands necessary for providing future parkland and lands presently used for national, state, county, or private parks;
>
> (2)    Lands suitable for growing and harvesting of commercial timber or other forest products;
>
> (3)    Lands suitable for outdoor recreational uses such as hunting, fishing, hiking, camping, and picnicking;
>
> (4)    Offshore islands of the State of Hawaii, unless placed in a (P) or (L) subzone;
>
> (5)    Lands and state marine waters seaward of the upper reaches of the wash of waves, usually evidenced by the edge of vegetation or by the debris left by the wash of waves on shore to the extent of the State's jurisdiction, unless placed in a (P) or (L) subzone.
>
> (c)    Land uses permitted in the resource (R) subzone are restricted to those listed in section 13-5-24.

(Emphasis added.)

HAR § 13-5-24 provides for the land uses allowed in resource (R) subzone and their required permits:

> (c)    Identified land uses in the resource subzone and their required permits, (if applicable), are listed below:
>
> (1)    Identified land uses beginning with letter (A) require no permit from the department or board;
>
> (2)    Identified land uses beginning with letter (B) require a site plan approval by the department;
>
> (3)    Identified land uses beginning with letter (C) require a departmental permit; and
>
> (4)    Identified land uses beginning with letter (D) require a board permit, and where indicated, a management plan.

(Emphasis added.)

Identified lands uses beginning with letter (D) include, among others:

> R-3    ASTRONOMY FACILITIES
>
> (D-1) Astronomy facilities under an approved management plan.

HAR § 13-5-24 (emphasis added). Therefore, according to the regulations, the proposed construction of new telescopes requires a board permit and an approved management plan.

B.    First Agency Appeal--Civil No. 04-1-397

In 2001, pursuant to HAR § 13-5-34, UHIFA submitted a CDUP application to BLNR to construct and operate up to six Outrigger Telescopes on the summit. The proposed land use required an approved management plan. BLNR determined the proposed management plan to be inadequate, but rather than denying the CDUP application, it remanded the case to a hearing officer for further evidentiary hearings. The Mauna Kea Appellants (comprised of MKAH, ROOK, Sierra Club, and Ching) requested a contested case hearing.

Evidentiary hearings on the management plan were held on October 29 and 30, 2003. On December 31, 2003, the hearing officer provided his Proposed Findings of Fact, Conclusions of Law and Decision and Order for Management Plan (FOF/COL and Decision & Order for Management Plan). The hearing officer concluded as a matter of law:

>     1.    The BLNR has jurisdiction over UHIFA's request for approval of a management plan.
>
>     2.    Astronomy facilities require an approved management plan. [HAR] § 13-5-24.
>
>     3.    Management plan approvals are different from board permit approvals. [HAR] § 13-5-30. *Compare* § 13-5-34 (board permits) with § 13-5-39 (management plan approvals). Conservation district use permits are not required for management plans.
>
>     4.    Public hearings are not required for management plan approvals. [HAR] § 13-5-40 (excluding management plans from the list of applications requiring public hearings).

(Emphases added.)

On October 29, 2004, BLNR granted UHIFA's CDUP application for the Outrigger Telescopes project. BLNR also approved the management plan.

On November 29, 2004, the Mauna Kea Appellants appealed BLNR's decisions to the circuit court. In the circuit court's January 19, 2007 Decision and Order (Civ. No. 04-1-397 Decision

and Order), the court reversed BLNR's decision granting the CDUP and found that the management plan did not satisfy the requirements of HAR §§ 13-5-2 and 13-5-24 that the plan be comprehensive. Therefore, the circuit court affirmed the FOF/COL, Decision and Order for the Management Plan "subject to [the circuit court's] decision that the Outrigger Management Plan approved thereby *is* not a 'management plan' within the meaning of HAR § 13-5-24 that is sufficient to support a [CDUP] for the Project." The circuit court further stated that a "'management plan' under [HAR] § 13-5-24 is a precondition to granting a CDUP for the R3 Resource Subzone land use at issue here." The circuit court also concluded that the "Mauna Kea Appellants' substantial rights have been prejudiced by the BLNR's approval of CDUP for UHIFA's Outrigger Telescopes Project and approval [of] the Outrigger Management Plan without an approved comprehensive management plan."

### C. Mauna Kea Management Area Management Plans

The DLNR, BLNR, and University have developed, adopted, and/or followed several management plans governing the Science Reserve and other areas on Mauna Kea. The "1995 Revised Management Plan for the UH Management Areas on Mauna Kea" (1995 Management Plan) was adopted by UH and DLNR to manage commercial use on the summit. UH retained management responsibilities for the astronomical facilities and the summit access road, and all other management responsibilities reverted back to DLNR. In 2000, the UH Board of Regents adopted the "2000 Mauna Kea Science Reserve Master Plan" (2000 Master Plan) -- "the policy framework for the responsible stewardship and use of university managed lands on Mauna Kea." At that time, the University established the Office of Mauna Kea Management to manage the various activities in the Management Area in accordance with 2000 Master Plan. The Office of Mauna Kea Management turns to the Mauna Kea Management Board, the Kahu Kū Mauna Council, and several advisory committees for advice on environmental and cultural issues.

7

### 1.   Development of the proposed CMP

Subsequent to the circuit court's decision rejecting the management plan UHIFA had submitted with its board permit application for the proposed Outrigger Telescopes project, the University enlisted Kuʻiwalu, a consulting company, to assist in preparing the CMP.  The resulting document was envisioned as an over-arching management tool for balancing and guiding the numerous activities carried out in the Management Area:

> This CMP provides the framework for managing multiple existing and future activities, such as astronomy, recreational and commercial activities, scientific research, and cultural and religious activities.  More importantly, the CMP provides a guide for protecting Mauna Kea's many unique cultural and natural resources.  Once the CMP is adopted by the BLNR, it will also provide management guidelines and specific management recommendations to be included in BLNR's CDUPs.

The CMP was intended to be "the approved management plan for UH Management Areas, supplementing, but at times superseding, the 1995 Management Plan."  According to the CMP, the 2000 Master Plan would continue to serve as the policy framework for the stewardship and use of the Management Areas, but would incorporate the CMP into any updates.  While drafting the CMP, Kuʻiwalu held several public meetings on the Island of Hawaiʻi "to seek input on the development of a [CMP] for the Mauna Kea Science Reserve."  After Kuʻiwalu completed a draft CMP, it held another round of public meetings inviting the community to review the draft and offer comment.  It also invited input online.  Qmark Research conducted 635 telephone interviews of Hawaiʻi residents statewide to, among other things, "determine respondents' level of support of programs and management of Mauna Kea."

### 2.   BLNR hearing on the proposed CMP

On April 8 & 9, 2009, BLNR held a board meeting in Hilo, pursuant to HRS Chapter 92 (sunshine law).  Petitioners contend this was not a Chapter 92 meeting, but, instead, was a contested case hearing pursuant to Chapter 91.  See E & J Lounge Operating Co. v. Liquor Comm'n of City & Cnty. of Honolulu, 118

Hawaiʻi 320, 334 n.20, 189 P.3d 432, 446 n.20 (2008) ("[HRS] chapter 92, by its own terms is inapplicable to contested case hearings."). BLNR contends the meeting was a regular board meeting held under Chapter 92. The agenda[5] noted BLNR's right to "go into Executive Session pursuant to [HRS §] 92-5(a)(4)," indicating that this was a regular board meeting held pursuant to HRS § 92-3 (1993).[6] One of the agenda items was the distribution of the March 27, 2009 minutes. According to the DLNR website[7]: "In a regularly scheduled BLNR meeting, discussions are recorded and later transcribed. All meeting minutes must be unanimously approved at the subsequent BLNR meeting. The minutes will be posted on this page once they are approved." The minutes of the April 8 & 9, 2009 meeting were transcribed and posted on the website. The minutes were "approved as submitted" at the BLNR board meeting on May 8, 2009.

The only substantive item on the April 8 & 9, 2009 agenda was the CMP

> for the Mauna Kea Science Reserve and UH Management Areas, by the University of Hawaii, Island of Hawaii, TMKs; (3) 4-4-015:009&012, including portions of the summit access road that extends from Hale Pohaku to the boundary of the Mauna Kea Science Reserve, including a 400-yard wide corridor on either side of the road, excluding those areas within the adjacent Mauna Kea Ice Age Natural Area Reserve.

The transcribed minutes provide details of what transpired at the meeting. DLNR staff member Sam Lemmo (Lemmo), Administrator of the Office of Conservation and Coastal Lands

---

[5] The agenda may be accessed at http://hawaii.gov/dlnr/chair/meeting/agendas/090408-agenda.pdf/view.

[6] HRS § 92-3 provides in relevant part:

> § 92-3 Open meetings. Every meeting of all boards shall be open to the public and all persons shall be permitted to attend any meeting unless otherwise provided in the constitution or as closed pursuant to sections 92-4 and 92-5 . . . . The boards shall afford all interested persons an opportunity to submit data, views, or arguments, in writing, on any agenda item. The boards shall also afford all interested persons an opportunity to present oral testimony on any agenda item.

[7] The DLNR website may be accessed at http://hawaii.gov/dlnr/chair/meeting/minutes/2009.

(OCCL),[8] presented first and explained his office's responsibility to review the CMP and make recommendations to BLNR regarding its adoption.  Lemmo discussed the history of Mauna Kea and the CMP and stated that the staff recommended the CMP be approved subject to a number of conditions.  Lemmo also reported that an Environmental Assessment had been filed.  When asked if the CMP would satisfy the requirement set forth in the Civ. No. 04-1-397 Decision and Order to provide a comprehensive management plan in conjunction with the CDUP petition for the Outrigger Telescopes, Lemmo indicated that the CMP was "not being submitted with a pending project" and he had not reviewed the CMP for compliance with the Civ. No. 04-1-397 Decision and Order as related to a specific project.[9]  Lemmo stated that the CMP identified a number of issues as outside the scope of the CMP, but acknowledged that others might believe those issues should have been addressed as part of a comprehensive plan.[10]

---

[8]  The OCCL is an office within DLNR and, among other responsibilities, oversees private and public lands in the State Land Use Conservation District (http://hawaii.gov/dlnr/occl).

[9]  The CMP provides:

As defined by DLNR Administrative Rules (HAR § 13-5-2), a management plan is "a comprehensive plan for carrying out multiple land uses."  This CMP specifically address multiple land uses and resource values within the UH Management Areas.  Pursuant to Judge Hara's decision of January 19, 2007, [Civ. No. 04-1-397 Decision and Order] BLNR shall approve a comprehensive management plan that considers multiple uses as a precondition for any future development on Mauna Kea (see [CMP] Section 3.2).  This CMP is being prepared in accordance with Judge Hara's decision.

[10]  The CMP specifically identified policy topics it considered outside the scope of the CMP, including:

- Termination of the State Lease between the University and the BLNR
- Use of ceded lands for $1 a year or nominal consideration
- Subleases between the University and the observatories
- Extension of the State lease beyond 2033
- Decommissioning
- Proposed new development on Mauna Kea, including the Thirty Meter Telescope (TMT) and Pan Starrs
- Community benefit package with increased educational benefits
- Guaranteed employment opportunities for Native Hawaiians and the people on the Island of Hawai'i

Representatives from the University made presentations. In the presentation by Ku'iwalu, the consultant team hired to develop the CMP, it was emphasized that the CMP was "not proposing any land use in the Management Actions, but rather, recommend[ing] actions for [the Office of Mauna Kea Management] to consider as they implement the CMP which [the Office of Mauna Kea Management] will be responsible for and any future land use of conservation lands [which] will go before the BLNR for approval." The CMP described itself as "an integrated planning tool for resource management that reflects updated guidance, supports the need for rule-making authority, and engages the community." The CMP further stated:

> This CMP provides the framework for managing multiple existing and future activities, such as astronomy, recreational and commercial activities, scientific research, and cultural and religious activities. More importantly, the CMP provides a guide for protecting Mauna Kea's many unique cultural and natural resources. Once the CMP is adopted by the BLNR, it will also provide management guidelines and specific management recommendations to be included in BLNR's CDUPs.

A BLNR member again raised a question about the relationship between the CMP and the Civ. No. 04-1-397 Decision and Order. As recorded in the minutes, the BLNR member

> asked [Ku'iwalu] that the CMP does not propose any new land uses, but your slide earlier talked about conclusion of law from [the Civ. No. 04-1-397 Decision and Order] that said the management plan is the plan he called for and must cover multiple land uses within the larger overall area that UH controls. If you are not talking about land uses then how does it comply with his decision? [Ku'iwalu] explained that [the Office of Mauna Kea Management] viewed [the Civ. No. 04-1-397 Decision and Order] to consider multiple land uses, not confined to astronomy, but to also consider the infrastructure, recreational, commercial, all the multiple uses in developing a CMP. With respect to proposed uses, what [the Civ. No. 04-1-397 Decision and Order] did say was approval of a CMP was a pre-condition to any new development. The way they interpreted [the Civ. No. 04-1-397 Decision and Order] is the management plan addresses and develops management tools for existing and potential future uses, but it does not authorize any future use. That will go through its own independent review process, through Chapter 343, through the CDUP process, but initially it must be in compliance with the CMP. The CMP is not proposing submitting an independent use in the plan other than a set of management recommendations of which [the Office of Mauna Kea Management] can impose.

UH confirmed that new developments would need to be in compliance with the overarching principles of the CMP.

BLNR opened the meeting for public testimony. Many members of the public testified, including Petitioners MKAH, Sierra Club, KAHEA, ROOK, and Ching, each of whom orally requested a contested case hearing.

BLNR closed public testimony around 12:30 p.m. on the second day and entered into deliberations. A BLNR member asked Lemmo to describe how a proposal for a new telescope would be handled under this CMP. According to the minutes, "Lemmo said any new telescope would be treated like any new proposals that have been treated requiring them to file a conservation use district application, an environmental document and a management plan at his office at OCCL." The BLNR member asked if there would be

> another management plan on top of the CMP. [Lemmo] said he didn't know about that and emphasized a management plan. Staff would process it like all applications, collect community input, schedule a public hearing in Hilo, accept public testimony on the matter, analyze all the issues and make a recommendation to the Land Board who decides whether or not another telescope would be allowed or not.

The minutes reflect that the BLNR member then asked "[i]f [BLNR] approves the CMP today does that mean they are approving more observatories or telescopes going forward? [Lemmo] said absolutely not."

At the end of deliberations, BLNR went into executive session for approximately 20 minutes "to consult with [BLNR's] attorney on [BLNR's] rights, duties, privileges, immunities and liabilities." After BLNR reconvened the hearing, the BLNR chairperson instructed the audience that anyone who wanted to request a contested case hearing needed to do so verbally (individual Petitioners already had) and then file a written request with BLNR within ten days. The chairperson then "summarized that [BLNR] approved the CMP subject to the following conditions to provide four specific plans for public access, natural resources, cultural resources and decommissioning of

telescopes, to bring it before [BLNR] by one year or prior to the submission of the next CDUP." Specifically, BLNR approved the CMP subject to the following conditions:

1) That the University of Hawaii Board of Regents (BOR) is the entity responsible for the implementation of the CMP, subject to the oversight of the BLNR. The BOR may delegate its responsibility with the accompanying authorities to another entity within the University system, subject to the approval of the BLNR;

2) That within one year of the BLNR approval of the CMP, the BOR or its authorized designee shall provide the BLNR in writing and in person with the following information:
   • Status of the development of each sub plan;
   • Status of the development of each management action;

3) That the BOR or its authorized designee shall continue to submit annual reports to the BLNR (in writing and in person), which shall include the items listed in condition No. 2;

4) That within one year of the BLNR approval of the CMP, or the submission of a Conservation District Use Application, whichever occurs sooner, the University shall submit for review and approval the following sub plans:
   • A cultural resources management plan;
   • A natural resources management plan;
   • A decommissioning plan, including a financial plan; and
   • A public access plan;

5) That amendments to the CMP shall be reviewed and approved first by the BOR, and second by the BLNR;

6) That the BOR recognizes that by approving the CMP, the BLNR has not delegated any authority (not already in existence) to the University with respect to land use approvals, leasing, or public access at Mauna Kea;

7) That within one year of the BLNR approval the CMP, or the submission of a Conservation District Use Application, whichever occurs sooner, the BOR or its authorized designee shall provide the BLNR (for review and approval) with a management and implementation framework, that has been authorized by the BOR, for project developments within UH Management Areas that is consistent with the specific management actions, conditions and policies of the CMP;

8) That failure to comply with these conditions may subject the University to the imposition of additional conditions to ensure compliance with the CMP and any penalties allowed under the law.

13

Petitioners filed timely written requests for a contested case hearing, which BLNR denied at its August 28, 2009 Board meeting. Petitioners filed their notice of appeal to the circuit court from BLNR's decision to approve the CMP and to deny Petitioners' request for a contested case hearing. The circuit court held that Petitioners failed to show that a contested case hearing was required, thus depriving the court of jurisdiction to review BLNR's approval of the CMP. With no jurisdiction to hear the agency appeal, the circuit court also held it had no jurisdiction to review BLNR's decision to deny Petitioners' request for a contested case hearing. The circuit court dismissed the appeal for lack of subject matter jurisdiction, and Petitioners timely appealed to this court.

## III.

"The right to appeal is purely statutory and exists only when jurisdiction is given by some constitutional or statutory provision." Lingle v. Hawaii Gov't Employees Ass'n, AFSCME, Local 152, AFL-CIO, 107 Hawaiʻi 178, 184, 111 P.3d 587, 593 (2005). As a threshold matter, "every court must . . . determine . . . whether it has jurisdiction to decide the issue[s] presented." Pele Defense Fund v. Puna Geothermal Venture, 77 Hawaiʻi 64, 67, 881 P.2d 1210, 1213 (1994). In the instant case, the question is whether the circuit court had subject matter jurisdiction to hear this case pursuant to HRS § 91-14, the statute that provides for judicial review of a contested case. In order to invoke the circuit court's jurisdiction under HRS § 91-14, the appellant must meet four requirements:

> first, the proceeding that resulted in the unfavorable agency action must have been a "contested case" hearing -- i.e., a hearing that was (1) required by law and (2) determined the "rights, duties, and privileges of specific parties"; second, the agency's action must represent "a final decision and order," or "a preliminary ruling" such that deferral of review would deprive the claimant of adequate relief; third, the claimant must have followed the applicable agency rules and, therefore, have been involved "in" the contested case; and finally, the claimant's legal

> interests must have been injured -- i.e., the claimant
> must have standing to appeal.
>
> [*Public Access Shoreline Hawai'i v. Hawai'i County Planning
> Comm'n (PASH)*], 79 Hawai'i [425,] 431, 903 P.2d [1246,] 1252
> [(1995)] (bold emphases added).

Kaleikini v. Thielen, 124 Hawai'i 1, 16-17, 237 P.3d 1067, 1082-83 (2010) (brackets omitted).

"Contested case means a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing." HRS § 91-1(5); see also Pele Defense Fund, 77 Hawai'i at 67, 881 P.2d at 1213.

HAR §§ 13-1-28 through 39 provide rules relating to contested case hearings for DLNR. Pursuant to HAR § 13-1-28,

> (a)  When required by law, the [BLNR] shall hold a contested
> case hearing upon its own motion or on a written petition
> of any government agency or any interested person.
>
> (b)  The contested case hearing shall be held after any
> public hearing which by law is required to be held on the
> same subject matter.

(Emphases added.)

HAR § 13-1-29(a) requires that a petitioner must make an oral or written request for a contested hearing "no later than the close of the board meeting at which the subject matter of the request is scheduled for board disposition." Additionally, the petitioner must submit a "written petition with the board for a contested case no later than ten calendar days after the close of the board meeting." Id. There is no dispute that Petitioners met the oral request and written petition requirements.

Pursuant to HAR § 13-1-29.1, BLNR, without a hearing, may deny a petitioner's request for a contested case hearing

> when it is clear as a matter of law that the request
> concerns a subject that is not within the adjudicatory
> jurisdiction of the board or when it is clear as a matter of
> law that the petitioner does not have a legal right, duty,
> or privilege entitling one to a contested case proceeding.

BLNR reviewed the written petitions for a contested case hearing and took oral testimony at its August 28, 2009 board

15

meeting.[11]  Subsequently, BLNR issued a letter denying the request for a contested case hearing.

Petitioners contend that BLNR was required to hold a contested case hearing before approving the CMP.  They argue that the April 8 & 9, 2009 BLNR meeting was a contested case hearing, even if it did not have all the attributes of a contested case hearing.  Petitioners cite to the following Hawaiʻi cases to support the proposition that the agency hearing need not comply with contested case requirements of HRS § 91-14 to still be considered a contested case hearing:  E & J Lounge, 118 Hawaiʻi at 350, 189 P.3d at 462 (The supreme court held that a contested case hearing was required by law and the Liquor Commission's decision was subject to judicial review under HRS 91-14 even though the hearing had not complied with HRS Chapter 91 provisions.); and Alejado v. City & County of Honolulu, 89 Hawaiʻi 221, 231, 971 P.2d 310, 320 (App. 1998) (This court concluded "that Appellant is entitled to a contested case hearing with the full procedural protection afforded by [HRS Chapter 91].  The record indicates, however, that while the January 8, 1997 rehearing constituted a contested case hearing, it did not comply with HRS Chapter 91.").  These cases stand for the proposition that if a hearing is required by law, a hearing that was held could be classified as a contested case hearing even if not in compliance with the contested case hearing procedures established by statute.  However, these cases do not stand for the proposition that the court has jurisdiction where a contested case hearing was not required by law.  If a contested case hearing was not required by law, the circuit court does not have jurisdiction under HRS § 91-14.  Pele Defense Fund, 77 Hawaiʻi at 69 n.10, 881 P.2d at 1215 n.10.

"In order for an agency hearing to be 'required by law,' it may be required by (1) agency rule, (2) statute, or (3)

_____

[11]  The board meeting minutes may be accessed at http://hawaii.gov/dlnr/chair/meeting/minutes/2009/090828-minutes.pdf.

constitutional due process." <u>Aha Hui Malama O Kaniakapupu v. Land Use Comm'n</u>, 111 Hawai'i 124, 132, 139 P.3d 712, 720 (2006). "[D]iscretionary hearings are not contested cases because they are not required by law." <u>Lingle</u>, 107 Hawai'i at 184, 111 P.3d at 593. If the regulations regarding approval of a management plan do not require a hearing before BLNR approves or denies the plan, then "the actions of the administrative agency are not 'required by law' and do not amount to a 'final decision or order in a contested case' from which a direct appeal to circuit court is possible." <u>Aha Hui Malama O Kaniakapupu</u>, 111 Hawai'i at 132, 139 P.3d at 720.

When BLNR is considering an application for a board permit for a proposed land use, the statutes and rules require a public hearing. Pursuant to HRS § 183C-6 (Supp. 2010), DLNR "shall hold a public hearing in every case involving the proposed use of land for commercial purposes, at which hearing interested persons shall be afforded a reasonable opportunity to be heard."

"Land use" is defined by statute as:

(1)    The placement or erection of any solid material on land;

(2)    The grading, removing, harvesting, dredging, mining, or extraction of any material or natural resource on land;

(3)    The subdivision of land; or

(4)    The construction, reconstruction, demolition, or alteration of any structure, building, or facility on land.

HRS § 183C-2. As defined in the statute, land use refers to specific activities involving the building of structures, the grading or otherwise moving of land or materials, or changing boundaries. "Land use" does not refer to a management plan devoid of a proposed use of land for specific commercial purposes.

HAR § 13-5-31 provides the general specifications of what to include in a permit application for a proposed land use for commercial purposes:

17

(1) A draft environmental assessment, or environmental impact statement, as applicable;

(2) Associated plans such as location map, site plan, floor plan, elevations and landscaping plans drawn to scale;

(3) The proposed land use shall address their relationship with county general plans and development plans;

(4) Any other information as determined by the department;

(5) Signature of the landowner;

(6) Applicable fees; and

(7) A minimum of twenty copies of the application and all attachments.

HAR § 13-5-34 provides additional information specific to board permits. HAR § 13-5-34 provides, in part:

§13-5-34 Board permits. (a) Applications for board permits shall be submitted to the department in accordance with section 13-5-31.

(b) A public hearing, if applicable, shall be held in accordance with section 13-5-40.
. . . .

(d) Contested case hearings, if applicable, and as required by law, shall be held as provided in chapter 13-1, subpart 5. The aggrieved appellant or person who has demonstrated standing to contest the board action may request a contested case hearing pursuant to chapter 13-1.

HAR § 13-5-39 regulates the approval of management plans. Specifically, the rule states:

§13-5-39 Management plan approvals. (a) Where required, management plans shall be submitted with the board permit application and shall include the requirements listed in Exhibit 3, entitled "Management Plan Requirements, dated September 6, 1994."

(b) An annual report to the department is required which shall include the status of compliance of the permit conditions and the implementation of land uses pursuant to the approved management plan schedule.

The "Management Plan Requirements" set forth in Exhibit 3 to HAR § 13-5-39 are as follows:

1. General Description
- Proposed land use in general terms
- How proposed land use is consistent with the purpose of the conservation district and the property's subzone
- Location map, drawn to scale

2. Existing conditions on parcel
- Ownership
- Resources (e.g. biological, archeological, geological)
- Presence of threatened or endangered species
- Constraints (e.g. flood plain, tsunami, volcanic, topography)
- Existing land uses
- Existing Conservation District Use Permits (CDUPs)
- Access
- Soils

3. Proposed land uses on parcel
- For each proposed land use:
  - Description of proposed land uses
  - Site plan
  - Justification that it is an identified land use for the subzone
  - Relationship to existing and other proposed land uses
  - Expected timing
  - Monitoring strategies
  - Environmental assessment
- Site plan showing location of all existing and proposed land uses
  - Steps to ensure that historic preservation concerns are met

4. Reporting schedule
- Time duration of management plan (start and end dates)
- Annual reporting schedule
- Annual reporting requirements

The April 8 and 9, 2009 BLNR meeting agenda indicated that the purpose of the meeting was to review and take comment on the proposed CMP. The CMP was presented as a stand-alone document unrelated to any specific proposed land use permit application. HRS § 183C requires a public hearing on proposed land uses, but does not require a public hearing on a proposed management plan presented separately from a board permit application. The land use regulations require a public hearing on a board permit application, but again, there is no requirement for a public hearing on a management plan proposed independent of any proposed land use. We find nothing under the applicable statute or rules to require a hearing on a comprehensive management plan submitted for approval separately from a board permit application. The April 8 & 9, 2009 hearing was not a contested case hearing pursuant to any statute or rule, and a hearing was not required by statute or rule.

19

Without a statute or rule requiring BLNR to hold a contested case hearing prior to approval of a management plan, the remaining question is whether a contested case hearing was required by constitutional due process. <u>Bush v. Hawaiian Homes Comm'n</u>, 76 Hawaiʻi 128, 135, 870 P.2d 1272, 1279 (1994).

Petitioners assert that "[t]he public, including [Petitioners], have a constitutionally protected interest in the lands within the Mauna Kea conservation district." Petitioners contend the CMP interferes with their constitutionally protected rights to traditional and customary native Hawaiian practices, but Petitioners do not demonstrate how the CMP would interfere with such rights. <u>See</u> <u>State v. Hanapi</u>, 89 Hawaiʻi 177, 970 P.2d 485 (1998).[12]

A hearing is mandated whenever a claimant seeks to protect a property interest for which he has "more than an abstract need or desire" and "more than a unilateral expectation." <u>Bush</u>, 76 Hawaiʻi at 136, 870 P.2d at 1280. The property interest must be one to which the claimant is legitimately entitled, but has been denied. <u>Id.</u>[13]

---

[12] In <u>Hanapi</u>, the Hawaiʻi Supreme Court stated:

> In order for a defendant to establish that his or her conduct is constitutionally protected as a native Hawaiian right, he or she must show, at minimum, the following three factors. First, he or she must qualify as a native Hawaiian within the guidelines set out in *PASH*.
>
> Second, once a defendant qualifies as a native Hawaiian, he or she must then establish that his or her claimed right is constitutionally protected as a customary or traditional native Hawaiian practice.
>
> Finally, a defendant claiming his or her conduct is constitutionally protected must also prove that the exercise of the right occurred on undeveloped or less than fully developed property.

89 Hawaiʻi at 185-86, 970 P.2d at 493-94 (internal quotation marks and citation omitted).

[13] Petitioners also cite to the Hawaiʻi Constitution, article XI, section 1 and article XII, section 4, which provide that natural resources and ceded lands are held in the public trust, and article XI, section 9, which provides for the public's right to a clean and healthful environment.

(continued...)

The CMP does not implicate University's property rights because no property rights are being granted or denied. The CMP is not a board permit application and does not propose or approve new land uses. Furthermore, the CMP does not affect the constitutionally protected rights of Petitioners. To support their contention that adoption of the CMP restricts their access and regulates their cultural practices, Petitioners cite to CMP Section 7-31. This section describes the "permitted uses, restrictions and conditions" in place under the previously-approved 1995 Management Plan, all of which are incorporated into the proposed CMP. Citing to another section of the CMP, Petitioners allege restrictions in the proposed "management actions" related to access, parking, visitor traffic, off-road vehicle use, hiking, hunting, etc. The CMP notes that many of these suggested actions "cannot be implemented without [UH] rule-making authority." As such, except for uses already in place under the 1995 Management Plan, these "management actions" are nothing more than considerations for the future.[14]

Petitioners' contention that the effect of the adoption of the CMP is to restrict public access and regulate cultural

---

[13](...continued)
However, it is not enough to identify a general public interest in the management of public lands. A claimant must have a legitimate interest which is being denied. Bush, 76 Hawai'i at 136, 870 P.2d at 1280.

[14] We note that the CMP specifically protects Native Hawaiian cultural observances and access:

> Subject to compliance with the legal requirements for access to traditional and customary practices of the State Constitution, no restrictions shall be placed on any Native Hawaiian cultural observance except those observances that are considered culturally inappropriate by a collective consensus of Kahu Ku Mauna, the MKMB Hawaiian Culture Committee, families with lineal and historic connections to Mauna Kea, cultural practitioners, and other Native Hawaiian groups. Access shall not be denied or unduly restricted for Native Hawaiians wanting to visit sites such as burials or shrines or exercise their religious and spiritual practices within the UH Management Areas. Public tours of burial sites shall be prohibited. The rangers or other management staff shall be notified of visits to burial sites prior to the visits for security and safety reasons.

practices, affecting Petitioners' constitutionally protected rights, is without merit.

We conclude that a contested case hearing was not required by law under statute, rule, or constitutional due process. Because a contested case hearing was not required, the circuit court did not err in dismissing Petitioners' appeal for lack of subject matter jurisdiction.

IV.

Therefore, the Final Judgment filed on February 17, 2010 in the Circuit Court of the Third Circuit is affirmed.

DATED: Honolulu, Hawai'i, January 25, 2012.

Martha Townsend
(Colin A. Yost and
Michael R. Cruise
(Cruise & Yost, LLC)
on the briefs) for
Petitioners/Appellants-
Appellants Mauna Kea
Anaina Hou; Royal Order
of Kamehameha I; Sierra
Club, Hawai'i Chapter;
KAHEA; and Clarence Ching.

*Daniel R. Foley*

Presiding Judge

Lisa Woods Munger
(Lisa A. Bail and Carly J.
Minner-Cole (Goodsill
Anderson Quinn & Stifel) and
Darolyn H. Lendio, University
General Counsel, and Bruce Y.
Matsui (Office of the General
Counsel) with her on the brief)
for Respondent/Appellees-Appellees
University of Hawai'i and University
of Hawai'i Institute for Astronomy.

*R. Mark Browning*

Acting Associate Judge

Acting Associate Judge

Julie H. China, Deputy Attorney General
(Donna H. Kalama, Deputy Attorney
General, with her on the brief)
for Appellee-Appellee Board
of Land and Natural Resources.

22